UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :
                  :     06-MD-1794 (PAC)

In Re Novartis Wage and Hour Litigation    :

                  :     <u>OPINION & ORDER</u>

                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

This consolidated class action lawsuit[1] raises the question of whether individuals employed as Pharmaceutical Sales Representatives ("Reps") are entitled to overtime pay under the federal Fair Labor Standards Act (the "FLSA" or "Act"), 29 U.S.C. §§ 201 et seq., and corresponding state wage and hour laws. Plaintiffs in this action are current and former Reps employed by Defendant Novartis Pharmaceuticals Corporation ("NPC") in New York, California, and other states.[2] They claim they qualify for overtime pay, and seek unpaid overtime wages, under the FLSA, as well as under the corresponding laws of New York and California.

NPC contends that Plaintiffs are not entitled to overtime pay because they fall within the "outside sales" and "administrative" exemptions to both the federal and state overtime requirements. NPC also argues that certain members of the Plaintiff class are exempt from the FLSA's overtime requirement because they qualify as "highly compensated" employees.

---

[1] The present action consolidates two cases. <u>Lopes v. Novartis Corporation et al.</u>, No. 06-Civ.-2268, was filed in this District on March 23, 2006. On October 31, 2006, the Judicial Panel on Multidistrict Litigation transferred the second case, <u>White v. Novartis Pharmaceutical Corporation</u>, No. 06-Civ.-11475, from the Central District of California and consolidated it with <u>Lopes</u> for the purpose of pre-trial proceedings.

[2] The Plaintiff class is subdivided into three groups: (1) employees who worked as Reps outside of New York and California between March 23, 2003 and April 7, 2007 and submitted a consent-to-join form; (2) employees who worked as Reps in California between March 23, 2002 and April 7, 2007 and did not opt out of the class; and (3) employees who worked as Reps in New York between March 23, 2000 and April 7, 2007 and did not opt out of the class. (<u>See</u> Order Certifying Fair Labor Standards Act Collective Action, Rule 23 Class Actions and Approving Notice (Docket #19, Feb. 15, 2007).)

Both parties have moved for summary judgment, and both claim there are no genuine issues of material fact.  Having reviewed the extensive record and heard oral argument from the parties, the Court agrees there are no factual issues, and that judgment as a matter of law is appropriate.  Plaintiff Reps are not entitled to overtime compensation because they are exempt from coverage as outside salespersons under the FLSA and state laws, and even if they are not outside salespersons, they are administrative employees and are still exempt.  NPC's motion for summary judgment is therefore GRANTED and Plaintiff's motion for summary judgment is DENIED.

## BACKGROUND

I.   **Facts**

Although the parties draw different legal conclusions from the factual record, the material facts themselves are straightforward and essentially undisputed.[3]  NPC researches, develops, manufactures, markets, and sells pharmaceutical drugs.  It is one of the largest drug manufacturers in the United States, with approximately 13,000 employees nationwide.

More than 6,000 of these employees are Pharmaceutical Sales Representatives.  In 2005, Reps earned an average salary of $91,500—meaning that, for the year, NPC spent a total of roughly half a billion dollars on Reps' salaries.  Some Reps earn in excess of $100,000 per year. NPC advertises its Rep positions as sales positions, and seeks to fill them with college graduates who are self-motivated, can work independently, and demonstrate good communication and interpersonal skills.  When hired, Reps are told that they are a part of NPC's sales force and that they will be engaged in selling NPC products.  Because new Reps often lack pharmaceutical

---

[3] The facts presented herein are derived from the parties' motions for summary judgment; their statements of fact submitted pursuant to Local Rule 56.1; and the transcript of the oral argument before this Court on November 18, 2008.

backgrounds, NPC provides them with basic training in anatomy, physiology, pharmacology, and other subjects.  New Reps are also trained in sales techniques before being sent out into the field.  NPC supplements this initial training with continuing education sessions during the course of the Reps' employment.

 The primary function of the Reps is calling on physicians and giving them information about NPC's drugs.  Each Rep is assigned to a geographic territory and provided with a target list of physicians.  Reps are further divided into three categories: "Mass Market" Reps call on general practice physicians; "Specialty" Reps call on specialists such as cardiologists or neurologists; and "Hospital" Reps call on major medical centers and teaching hospital personnel. Reps are assigned certain NPC drugs depending upon the type of physicians on their target list— for example, a Specialty Rep responsible for visiting a number of cardiologists would be assigned NPC drugs that are appropriate for a cardiologist to prescribe.  Indeed, the goal of the Reps' visits is to educate the physicians about NPC drugs so that the physicians may write prescriptions for those drugs where doing so would be appropriate for the physicians' patients.

 Since the Reps are advocating products which are routinely and closely regulated by the Food and Drug Administration (FDA), NPC prepares scripts and related materials which the Reps are expected to use to deliver a "core message" about NPC products to each physician they visit.  Reps may not go beyond the boundaries of the messages crafted by NPC.  For example, Reps may not make claims about the effectiveness of NPC's products, nor can they comment adversely on a competitor's product, unless these claims have been cleared by NPC.  NPC also controls the methods by which Reps may convey their message.  NPC provides Reps with drug samples, pamphlets, clinical studies, visual aids, and other materials, and gives instructions on how these materials should be used during the Reps' presentations.

While NPC provides Reps with core messages and supporting materials, Reps have discretion as to when and how they deploy them.  Reps plan their daily call schedules and decide when to visit each doctor on their target list.  Within the parameters set by NPC, Reps are expected to tailor their presentations to each individual physician based upon such variables as the amount of time the physician allocates to meeting with the Rep; the physician's patient base and prescribing habits; and the Rep's assessment of the physician's personality.  In addition, NPC provides Reps with budgets that they are expected to use to organize "lunch-and-learn" presentations and other informational events for the physicians on their list.  Reps select the speakers and invitees for these informational events following guidelines set by NPC.

Under applicable FDA regulations, Reps are barred from selling NPC drugs directly to physicians.  Instead, Reps focus on persuading physicians to write prescriptions that are ultimately used by patients in order to obtain NPC products from a pharmacy.  Reps are expected to end each physician visit with a "close."  Ideally, a Rep closes a visit by asking the physician for a non-binding commitment to prescribe NPC drugs where doing so is appropriate for a patient.  At other times, a Rep might close by asking the physician to review a clinical study supporting the use of an NPC product or even simply thanking the physician for his or her time.

In addition to base pay, Reps receive "incentive payments."  These incentive payments are tied to the number of prescriptions written by physicians within the Reps' territory for drugs to which the Reps is assigned.  Plaintiffs concede that between 15% and 25% of a Rep's average annual salary of $91,500 consists of incentive pay.  Payments of between $13,725 and $22,875 are significant components of a Rep's annual salary.  Additionally, NPC provides Reps with company cars and fuel costs to facilitate their physician visits.  High-performing Reps are eligible for additional benefits such as all-expenses-paid vacations.

Reps do not work out of NPC's offices.  They work from their homes, and spend most of their day traveling, in their company-provided vehicles, from physician to physician.  Once every four to six weeks, their managers accompany them on their calls in what is known as a "ride-along."  Aside from these ride-alongs, Reps are generally on their own, subject to such supervision as can be gained by cell phone and e-mail communications with supervisors.  Although NPC expects Reps to be in the field making calls from 8 a.m. to 5 p.m. each weekday, and expects Reps to call on a certain number of physicians each day, Reps are ultimately responsible for organizing their daily activities.

At all times relevant to the present action, NPC classified its Reps as exempt from the FLSA's overtime requirement.  Plaintiffs have no complaint about their salary, which is well in excess of the statutory minimum.  Instead, Plaintiffs contend they should be compensated at time-and-a-half for hours worked in excess of 40 hours per week.

## II.    The Fair Labor Standards Act (FLSA) and Corresponding State Laws

### A.    The FLSA

The FLSA was enacted 70 years ago, in 1938, to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."  29 U.S.C. § 202(a).  To that end, the FLSA imposes various wage and hour requirements, including the overtime requirement at issue in the present case.  Section 207(a)(1) of the Act provides that "no employer shall employ any of his employees…for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  Id. § 207(a)(1).

Section 213(a)(1) establishes the so-called "white collar" exemptions to the overtime

requirement, including the outside sales and administrative exemptions.  See id. § 213(a)(1).  In

2004, the Department of Labor ("DOL")[4] explained the rationale behind these exemptions:

> The legislative history [of the FLSA] indicates that the section
> 13(a)(1) exemptions were premised on the belief that the
> workers exempted typically earned salaries well above the
> minimum wage, and they were presumed to enjoy other
> compensatory privileges such as above average fringe benefits
> and better opportunities for advancement, setting them apart
> from the nonexempt workers entitled to overtime pay.  Further,
> the type of work they performed was difficult to standardize to
> any time frame and could not be easily spread to other workers
> after 40 hours in a week, making compliance with the overtime
> provisions difficult and generally precluding the potential job
> expansion intended by the FLSA's time-and-a-half overtime
> premium.

Dep't of Labor, Wage and Hour Division, Defining and Delimiting the Exemptions for

Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule

("DOL 2004 Final Rule"), 69 Fed. Reg. 22122, 22123-24 (Apr. 23, 2004).

Due to the remedial nature of the FLSA's overtime requirement, however, exemptions

should be "narrowly construed against the employers seeking to assert them and their application

limited to those establishments plainly and unmistakably within their terms and spirit."  Bilyou v.

Dutchess Beer Distribs., Inc., 300 F.3d 217, 222 (2d Cir. 2002) (quoting Arnold v. Ben

Kanowsky, Inc., 361 U.S. 388, 392 (1960)).  An employer who invokes an exemption bears the

burden of proving that its employees are exempt.  See Bilyou, 300 F.3d at 222.

### 1. The Outside Sales Exemption

FLSA section 213(a)(1) exempts from overtime compensation "any employee

---

[4] The FLSA grants the Secretary of Labor broad authority to "define[] and delimit[]" the exemptions to the overtime requirement "from time to time by regulations."  29 U.S.C. § 213(a)(1).  The DOL's regulations therefore "have the force of law…and are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary to the statute."  Freeman v. Nat'l Broad. Co., Inc., 80 F.3d 78, 82 (2d Cir. 1996).  The DOL also issues interpretive regulations setting forth the Secretary's official position on how the regulations should be applied.  These interpretations do not have the force of law, but they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

employed…in the capacity of outside salesman." 29 U.S.C. § 213(a)(1).  An outside salesperson

is defined as any employee:

> (1) Whose primary duty is:
> (i) making sales within the meaning of Section 3(k) of the
> Act; or
> (ii) obtaining orders or contracts for services or for the use
> of facilities for which a consideration will be paid by the
> client or customer; and
> (2) Who is customarily and regularly engaged away from the
> employer's place or places of business in performing such primary
> duty.

29 C.F.R. § 541.500(a).

The terms "sale" and "sell" include "any sale, exchange, contract to sell, consignment for

sale, shipment for sale, or other disposition."  29 U.S.C. § 203(k).  The DOL has further

indicated that "[s]ales within the meaning of section 3(k) of the Act include the transfer of title to

tangible property, and in certain cases, of tangible and valuable evidences of intangible

property."  29 C.F.R. § 541.501(b).  In the 1940 "Stein Report," the DOL stated that it would be

improper to extend the outside sales exemption to "anyone who does not in some sense make a

sale."  Dep't of Labor, Wage and Hour and Public Contracts Divisions, Report and

Recommendations of the Presiding Officer (Harold Stein) on Proposed Revisions of Regulations

(Oct. 10, 1940) ("Stein Report") at 46; see also DOL 2004 Final Rule, 69 Fed. Reg. at 22162

("An employer cannot [apply the outside sales exemption] unless it demonstrates that the

employee, in some sense, has made sales.").

An employee's primary duty is "the principal, main, major or most important duty that

the employee performs."  29 C.F.R. § 541.700(a).  A determination of an employee's primary

duty "must be based on all the facts in a particular case, with the major emphasis on the character

of the employee's job as a whole."  Id.  For the purposes of determining whether an employee

falls within the outside sales exemption, all work that is "performed incidental to and in conjunction with the employee's own outside sales or solicitations" or "that furthers the employee's sales efforts" must be counted as exempt outside sales work.  Id. § 541.500(b).  In other words, once it has been determined that an employee makes sales, all work done by that employee incidental to those sales must be taken into account when determining whether sales work constitutes the employee's primary duty.

       The DOL's regulations draw a distinction between exempt and non-exempt promotional work.  "Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work.  On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work."  Id. § 541.503(a).  The DOL gives an example of promotional work incidental to sales made by others: a manufacturer's representative who visits a customer's shop for the purposes of "putting up displays and posters, removing damaged or spoiled stock from the merchant's shelves or rearranging the merchandise."  Id. § 541.503(b).  Further, in a 1999 Opinion Letter, the DOL determined that college recruitment counselors were not exempt outside salespersons because they were "not engaged in making sales of the college's services, or obtaining contracts for its services."  Opinion Letter No. 2138 [1999-02 Wages-Hours] Lab. L. Rep. (CCH) ¶ 33030 (Apr. 20, 1999).  Instead, the counselors engaged in non-exempt promotional work by "identifying qualified customers, i.e. students, and inducing their application to the college, which in turn decides whether to make a contractual offer of its educational services to the applicant."  Id.

       2. The Administrative Exemption

       The FLSA also exempts "any employee employed in a bona fide…administrative

…capacity" from the overtime requirement.  29 U.S.C. § 213(a)(1).  The DOL defines an

administrative employee as one who earns more than $455 per week and whose primary duties

include: (1) "the performance of office or non-manual work directly related to the management

or general business operations of the employer or the employer's customers" and (2) "the

exercise of discretion and independent judgment with respect to matters of significance."  29

C.F.R. § 541.200(a).  Application of the administrative exemption therefore involves a "two-part

inquiry" which takes into account both the "type of work" the employee performs and the "level

or nature" of that work.  DOL 2004 Final Rule, 69 Fed. Reg. at 22144.

> a. Office or non-manual work directly related to management or general business
> operations

In order to meet the first requirement, "an employee must perform work directly related

to assisting with the running or servicing of the business, as distinguished, for example, from

working on a manufacturing production line or selling a product in a retail or service

establishment."  29 C.F.R. § 541.201(a).  Administrative work is therefore distinct from

production work, although the DOL has cautioned that the administrative/production distinction

is but "one analytical tool" for determining whether the exemption applies, and that it is only

outcome determinative where the employee's work "falls squarely on the production side of the

line."  DOL 2004 Final Rule, 69 Fed. Reg. at 22141.

Exempt administrative work includes "advising the management, planning, negotiating,

representing the company, purchasing, promoting sales, and business research and control.

Much of this work, but not all, will relate directly to management policies."  Id. at 22138.  The

administrative exemption also covers "a wide variety of persons who either carry out major

assignments in conducting the operations of the business, or whose work affects business

operations to a substantial degree, even though their assignments are tasks related to the

operation of a particular segment of the business." <u>Id.</u>  The DOL has stated that work related

directly to management or general business operations:

> includes, but is not limited to, work in functional areas such as
> tax; finance; accounting; budgeting; auditing; insurance; quality
> control; purchasing; procurement; advertising; marketing;
> research; safety and health; personnel management; human
> resources; employee benefits; labor relations; public relations;
> government relations; computer network, internet and database
> administration; legal and regulatory compliance; and similar
> activities.

29 C.F.R. § 541.201(b).

> *b. Discretion and independent judgment with respect to matters of significance*

The DOL defines "the exercise of discretion and independent judgment" as "the

comparison and the evaluation of possible courses of conduct, and acting or making a decision

after the various possibilities have been considered.  The term 'matters of significance' refers to

the level of importance or consequence of the work performed." <u>Id.</u> § 541.202(a).  In

determining whether an employee meets this requirement, the DOL has provided an extensive,

though not exhaustive, list of "[f]actors to consider":

> whether the employee has authority to formulate, affect, interpret,
> or implement management policies or operating practices; whether
> the employee carries out major assignments in conducting the
> operations of the business; whether the employee performs work
> that affects business operations to a substantial degree, even if the
> employee's assignments are related to the operation of a particular
> segment of the business; whether the employee has authority to
> commit the employer in matters that have significant financial
> impact; whether the employee has authority to waive or deviate
> from established policies and procedures without prior approval;
> whether the employee has authority to negotiate and bind the
> company on significant matters; whether the employee is involved
> in planning long- or short-term business objectives; whether the
> employee investigates and resolves matters of significance on
> behalf of management; and whether the employee represents the

> company in handling complaints, arbitrating disputes or resolving
> grievances.

Id. § 541.202(b).  "Federal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment…."  DOL 2004 Final Rule, 69 Fed. Reg. at 22143.

The DOL has cautioned that the mere "use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources" falls short of discretion and independent judgment.  29 C.F.R. § 541.202(e).  Instead, an employee must "ha[ve] the authority to make an independent choice, free from immediate direction or supervision" in order to be exempt.  Id. § 541.202(c).  The employee need not, however, be the final decision-maker.  To the contrary, "[t]he fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment."  Id. § 541.202(c).

Depending upon the nature of the employer's business, a large number of employees may satisfy the second requirement of the administrative exemption.  "The fact that many employees perform identical work or work of the same relative importance does not mean that the work of each such employee does not involve the exercise of discretion and independent judgment with respect to matters of significance."  Id. § 541.202(d).

### 3. The Highly Compensated Employee Exemption

In August 2004, the DOL created an exemption to the overtime requirement for highly compensated employees, defined as employees who: (1) receive total annual compensation of at least $100,000 (including commissions and other non-discretionary compensation) and a weekly salary of at least $455 per week, and (2) "customarily and regularly perform[] any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee."

Id. § 541.601(a)-(b)(1).  Employees "customarily and regularly" perform a duty if they perform it more than occasionally but less than constantly.  Id. § 541.701.  In other words, employees who earn at least $100,000 are exempt from the FLSA's overtime requirement if they perform at least one exempt administrative duty with some degree of regularity.

### B.   New York and California Overtime Laws

Under New York law, as under the FLSA, employees are entitled to overtime pay for every hour they work beyond 40 in a week.  New York law also exempts employees who qualify as outside salespersons or administrative employees from the overtime requirement, and it defines and applies these exemptions in the same manner as the FLSA.  See 12 N.Y.C.R.R. § 142-2.14(5); Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 575 (S.D.N.Y. 2004).[5]

California's wage and hour laws are essentially the same as the FLSA and New York law: employees are entitled to overtime for each hour worked above 40 in a week, provided they do not fall within certain exemptions.  California law also exempts employees who qualify as outside salespersons or administrative employees—but the ways in which these exemptions are defined differs slightly.  In order to qualify as an outside salesperson, sales activities must account for "more than half" of the employee's working time.  Cal. Code Regs. Tit. 8, § 11070(2)(J).  This "quantitative" test differs slightly from the "primary duty" test contained in the FLSA.  Similarly, California's administrative exemption requires that an employee be "primarily engaged" in administrative tasks rather than having those tasks as his or her "primary duty," but otherwise it mirrors the federal exemption.  Id. § 11070(1)(A)(2)(f).

---

[5] The parties agree that there is no difference between the relevant provisions of the FLSA and New York law.  (See Pl. Mem. in Support of Summ. Judg. ("Pl. Mem.") at 19-20; Def.'s Mem. in Support of Summ. Judg. ("Def. Mem.") at 9 fn.6.)  Consequently, in the discussion that follows, the Court will analyze the applicability of the FLSA and New York exemptions together.  See infra Parts IV.A and V.A.

Neither New York nor California law contains an analog to the FLSA's exemption for highly compensated employees.

## DISCUSSION

### III.   Summary Judgment Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under governing law…." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The evidence on each material element must be sufficient to entitle the movant to relief as a matter of law. Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations omitted), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 127 S.Ct. 1769, 1776 (2007) (citing Fed. R. Civ. P. 56(c)).

The same standard of review applies when the court is faced with cross-motions for summary judgment. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). Each

party's motion must be reviewed on its own merits, and the Court must draw all reasonable

inferences against the party whose motion is under consideration.  Id.

## IV.    The Outside Sales Exemption

### A.    The FLSA and New York Law

In their motion for summary judgment, Plaintiffs argue that they do not fall within the

outside sales exemption because they:

> fail to meet the essential prerequisite of the outside sales
> exemption: making sales.  NPC Reps do not sell drugs to the
> doctors they visit.  With physicians, Reps do not exchange any
> good or service, contract to sell any good or service, consign for
> sale any good or service, or obtain orders or contracts for the use
> of facilities.  No money or title to drugs ever changes hands
> between Reps and doctors.  Indeed, it is illegal for Reps to sell
> pharmaceuticals, and such a sale is cause for dismissal.

(Pls.' Mem. in Support of Summ. Judg. ("Pl. Mem.") at 3.)  In other words, Plaintiffs claim they

are not exempt because they do not execute sales within the plain meaning of the FLSA and the

DOL regulations.  (Pls.' Opp. to Def.'s Motion for Summ. Judg. ("Pl. Opp.") at 17 (citing

Amendola v. Bristol-Myers Squibb Co., 558 F. Supp. 2d 459, 470 (S.D.N.Y. 2008).)  Instead,

Plaintiffs categorize their activities as mere "promotion," and therefore argue that they are

entitled to overtime pay.  (See id. at 22.)

Defendant NPC, in its motion for summary judgment, claims that Reps fall within the

"long-standing judicial and common sense understandings of the 'outside sales' exemption."

(Def.'s Mem. in Support of Summ. Judg. ("Def. Mem.") at 9.)  It urges the Court to focus on the

purpose of the exemption and the practicalities of the pharmaceutical industry in determining

whether Reps are exempt.  (Id. at 10.)  Defendant argues that the prescriptions which Reps seek

to elicit from the physicians they visit "are, in essence, orders for NPC drugs to be used by the

patients in purchasing NPC's drugs from pharmacies.  Without prescriptions, patients cannot buy

the drugs and there is no sale…."  (Id. at 15.)  Moreover, Reps do not engage in non-exempt promotional work because they make solicitations for themselves rather than others—their compensation depends, in substantial measure, upon the prescriptions they generate.  (Id. at 11-12.)

This Court must construe the outside sales exemption narrowly in order to ensure that it is only applied to those employees who fit "plainly and unmistakably within [its] terms and spirit."  Bilyou, 300 F.3d at 222.  In doing so, however, the Court must not lose sight of the FLSA's practical goals.  Adopting Plaintiffs' constricted reading of the FLSA ignores the Act's spirit, purpose, and goals.

One of the earliest and clearest explanations of the rationale behind the outside sales exemption was provided by the Tenth Circuit in Jewel Tea Co. v. Williams et al., 118 F.2d 202 (10th Cir. 1941):

> The reasons for excluding an outside salesman are fairly apparent. Such salesm[a]n, to a great extent, works individually.  There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates.  In lieu of overtime, he ordinarily receives commissions as extra compensation.  He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day.  To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

Id. at 207-08.

Jewel Tea teaches that outside salespersons are exempt from the overtime requirement not because they "sell," as that term is technically defined, but rather because they (1) generate commissions for themselves through their work and (2) work with minimal supervision, making adherence to an hours-based compensation scheme impractical.  The Jewel Tea rationale is

echoed in the DOL's 2004 Final Rule, which notes that the "white collar" exemptions owe their existence to the fact that the employees they were meant to cover "typically earned salaries well above the minimum wage, and they were presumed to enjoy other compensatory privileges such as above average fringe benefits and better opportunities for advancement…."  69 Fed. Reg. at 22124.  The DOL Final Rule also recognizes that the work done by these employees "was difficult to standardize to any time frame…making compliance with the overtime provisions difficult…."  Id.

Of course, the Court must first determine whether Reps engage in selling.  Indeed, the DOL regulations and the case law are clear that the outside sales exemption cannot apply to any employee who does not make sales in some sense.  29 C.F.R. § 541.500; DOL 2004 Final Rule, 69 Fed. Reg. at 22162-63; see also Ackerman v. Coca-Cola Enterprises, Inc., 179 F.3d 1260, 1265 (10th Cir. 1999) (holding that the exemption cannot apply "if the employee in question does not actually consummate the sale….").

"Given the broad scope of the FLSA and its implementing regulations, which reach all employees involved in interstate commerce, see 29 U.S.C. §§ 202(a)-(b), 207(a)(1), the regulations provide only general guidance to accommodate the varying needs of employers and employees in a diverse and varied national economy."  Havey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citation omitted).  Recognizing this, courts have taken into account the characteristics of the industry in question when determining the applicability of the outside sales exemption.  For example, in Nielsen v. DeVry, Inc., 302 F. Supp. 2d 747 (W.D. Mich. 2003), the court described the nature of plaintiff field representatives' interactions with potential students, as well as the nature of defendant school's admissions process, before finding that the field representatives fell within the outside sales exemption.  Id. at 755-56.  Similarly, in

<u>Gregory v. First Title of America, Inc.</u>, No. 06-Civ.-1746, 2008 WL 150487 (M.D. Fla. Jan. 14, 2008), the court held that plaintiff, whose job was to refer customers to defendant insurance company, "obtained orders" and was therefore covered by the outside sales exemption even though "Plaintiff could not sell title insurance herself because she was not licensed to do so." <u>Id.</u> at *2 (also noting that plaintiff's "compensation was tied to how many orders for service she obtained").

In <u>Medtronic, Inc. v. Gibbons</u>, 527 F. Supp. 1085 (D. Minn. 1981), <u>aff'd</u> 684 F.2d 565 (8th Cir. 1982), a case dealing with a dispute over an employment contract, the district court described the nature of sales in the medical device industry as follows:

> The ultimate consumer[s] of pacemakers are cardiac patients, not hospitals or doctors.  But the pacemakers are sold by the manufacturers to the hospital where the patient is being treated. The hospital purchases pacemakers on recommendations from a physician….Medtronic's sales effort focuses on the physicians and medical personnel.  Thus, the term "customers" must include not only the hospital, which actually pays for the product, but also the physicians and surgeons who recommend which product to purchase.

<u>Id.</u> at 1094 fn.3.

The <u>Medtronic</u> court's description of sales in the medical device industry is instructive for understanding the nature of the sales made by Reps in the present case.  The FDA regulates the pharmaceutical industry in myriad ways, controlling, among other things, how drugs may be researched, manufactured, labeled, sold, distributed, and prescribed.  <u>See</u> 21 U.S.C. §§ 351 <u>et seq.</u>  Legally, Reps cannot sell NPC drugs directly to physicians.  (<u>See</u> Pls.' Rule 56.1 Statement of Undisputed Facts ("PSUF") ¶¶ 107, 109, 110, 112.)  Further, physicians have an ethical obligation to prescribe only drugs suitable for their patients' medical needs, meaning that they cannot make a binding commitment to a Rep to prescribe certain NPC products.  (<u>See</u> Pl. Opp. at

21 fn.13.)  Nevertheless, like the physicians who had the authority to recommend the purchase of

certain medical devices in <u>Medtronic</u>, the physicians called upon by Reps ultimately control the

purchase of NPC products by writing prescriptions.  In fact, in the present case, physicians are

arguably more integral to sales than their counterparts in <u>Medtronic</u> because, absent a

prescription from a doctor, the patient end-users of NPC drugs are not able to obtain those drugs.

NPC spends in excess of $500 million annually to have its Reps meet on a frequent and repeat

basis with these physicians to seek their commitments to prescribe NPC products.  In other

words, Reps make sales in the sense that sales are made in the pharmaceutical industry.

     Moreover, as the First Circuit recently recognized in <u>IMS Health Inc. v. Ayotte</u>, __ F. 3d

__, No. 07-1945, 2008 WL 4911262 (1st Cir. Nov. 18, 2008), Reps are highly effective at

making sales.  The <u>IMS Health</u> court used the term "detailing" to refer to the work carried out by

pharmaceutical sales representatives, explaining that "[d]etailing is the face-to-face advocacy of

a product by sales representatives who visit doctors' offices and hospitals to meet with the

prescribing health care professionals….[T]he objective of these visits is to make sales…."  2008

WL 4911262, at *26.  "Detailing works: that it succeeds in inducing physicians to prescribe

larger quantities of brand-name drugs seems clear….The fact that the pharmaceutical industry

spends over $4,000,000,000 annually on detailing bears loud witness to its efficacy."  <u>Id.</u> at *12.

In recognition of the significant influence of Reps on physicians' prescribing habits—which

arguably led physicians to prescribe brand-name pharmaceuticals instead of cheaper generic

drugs—the <u>IMS Health</u> court upheld a New Hampshire law that limited Reps' access to

physicians' prescribing histories on the grounds that these histories allowed Reps "to target

particular physicians and shape their sales pitches accordingly."  <u>Id.</u> at *1.  The fact that the First

Circuit's decision does not address the FLSA is of no consequence: it provides a clear,

convincing, and practical discussion of the nature and effect of the Reps' work and, as such, supports the logical conclusion that Reps make sales.

Plaintiffs argue that "[NPC] sells drugs to distributors.  Distributors sell drugs to pharmacies.  Pharmacies sell drugs to individuals."  (Oral Argument Transcript, Nov. 18, 2008 ("OA Tr.") at 5:9-10.)  In other words, Plaintiffs ask this Court to conclude that the only true sales made by NPC are to distributors.  The Court cannot ignore reality.  Distributors are not the end-users of NPC's products.  If physicians did not prescribe NPC products, patients would be unable to buy them and distributors would have no incentive to make purchases from NPC.  The purchase cycle commences with a prescription from physicians, who are therefore the appropriate target of the Reps' sales efforts.  When the physician writes a prescription for the NPC product, then a sale can take place.  "Without prescriptions, patients cannot buy the drugs and there is no sale."  (Def. Mem. at 15.)

Plaintiffs' argument that Reps' activities constitute mere "promotional work" is simply wrong.  Contrary to Plaintiffs' assertion that "[t]he DOL's current regulations reaffirm [a] promotion versus sales distinction" (Pl. Mem. at 21), the DOL in fact does not draw a distinction between "sales" and "promotion."  Rather, the DOL distinguishes between promotional activities that are exempt, because they relate to the employee's own sales, and promotional activities that are non-exempt, because they pave the way for sales made by others.  See 29 C.F.R. § 541.503(a) ("Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work.  On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work."); see also Stein Report at 46 (stating that promotional employees "engaged in paving the way for salesmen" are not exempt); DOL 2004 Final Rule, 69 Fed. Reg. at 22162

(refusing to "[e]xtend[] the outside sales exemption to include all promotion work, whether or not connected to an employee's own sales….").

Here, any promotional work Reps undertake is directed towards the consummation of their own sales, and therefore exempt.  The incentive pay structure in the Reps' salaries is also a strong indicator that in some sense they are making a sale.  Incentive payments are tied to the number of prescriptions written by physicians on a Rep's target list for drugs to which the Rep is assigned.  (See Def. Opp. at 8; OA Tr. at 22:20-25:5.)  Undoubtedly the incentives are substantial and average between $13,000 and $23,000 of the average salary of $91,500.

Plaintiffs argue that incentive payments do not necessarily match specific sales to specific Reps.  It is uncontested that more than one Rep might visit a particular physician to discuss a particular drug, and factors other than a Rep's presentation might influence a physician's decision to prescribe an NPC product.  (See Pl. Opp. at 22.)  But there is nothing that requires a one-for-one match.  (See, e.g., Prendergast Dep. at 91:12-19.)  The incentive structure makes clear that it rewards a Rep's success in persuading physicians to write prescriptions.  The more prescriptions written by the physicians covered by the Rep, the greater the incentive pay the Rep receives.  As Defendant recognizes: "NPC's Sales Reps seek commitments for their 'own' account in the only practical sense that matters, namely that they receive incentive pay (and are evaluated) for prescriptions written by the physicians on whom they call."  (Def. Opp. at 8.)  The Reps themselves recognize this as well: in their yearly self-evaluations, they often emphasize their role in increasing market share for their assigned drugs by persuading certain physicians to write prescriptions for those drugs.  (See, e.g., Tobertga Dep. Ex. 3; Lopes Dep. Ex. 8.)[6]  Reps

---

[6] Just as Plaintiffs mischaracterize themselves as "robots" and "automatons" in an attempt to avoid a finding that they have discretion and exercise independent judgment (see infra Part V.A.2), here they argue that Reps are less than truthful in filling out their annual evaluation forms which describe their efforts to improve sales.  Plaintiffs contend that their self-evaluations cannot be relied upon because "Reps exaggerate their efforts on calls and try to

therefore "'obtain a commitment to buy' from the customer and are credited with the sale."
DOL 2004 Final Rule, 69 Fed. Reg. at 22162.

Given the FDA's regimen controlling how drugs are sold and delivered to patients, it is
clear that Reps do not pave the way for sales that will be made by others.  In <u>Wirtz v. Keystone</u>
<u>Readers Service, Inc.</u>, 418 F.2d 249 (5th Cir. 1969), the court was faced with a classic example
of non-exempt promotional activity.  Plaintiff employees promoted magazine subscriptions by
going door-to-door and persuading customers to fill out a non-binding order card.  <u>Id.</u> at 252.
Later, "student managers" would call on the potential customers identified by the order cards and
attempt to persuade the customers to enter into binding sales orders for more expensive items.
<u>Id.</u>  The situation in the present case is clearly different because there is no equivalent of the
"student managers," i.e. there are no other NPC employees who consummate sales whose
foundations were laid by the Reps.  Reps are the only NPC employees who meet with physicians
in an attempt to persuade them to write prescriptions.  Nor is it a one-time event.  The whole
premise of assigned territories, with assigned physicians and frequent and repeated calls over
time, is to build up a relationship so that with each call the physician is convinced that he or she
will be treating patients appropriately by prescribing NPC products.  To the extent these
physicians write prescriptions for NPC drugs, it is the Reps—and not other NPC employees—
who obtain these prescriptions and who receive credit for them by means of incentive payments.

Reps also enjoy the independence traditionally associated with outside salespersons.
They work outside of NPC's offices and they have the ability, within certain reasonable limits, to

---

match NPC's proffered language regarding the criteria on which they are to be judged."  (Pls.' Response to Def.'s
Statement of Undisputed Facts ("Pls.' Response to DSUF") at 37.)  NPC, however, is not evaluating its employees
and compensating them up to 25% of their base salary based on so-called "exaggerations."  Even if Reps make use
of NPC "buzzwords," their yearly evaluations are realistic and known to involve a substantial part of their
compensation.  In her 2004 evaluation, for example, Plaintiff Simona Lopes identifies four specific doctors with
whom she increased market share for the NPC drug Lotrel by specific percentages.  (Lopes Dep. Ex. 8 at
NPCXW&H120.)  In that same review, her manager cited to her success with these doctors as evidence of her
ability to "improv[e] Lotrel share in difficult to see customers…."  (<u>Id.</u> Ex. 8 at NPCXW&H127.)

set the schedule for their workday.  Aside from the occasional "ride-along" with a manager (once every four to six weeks, i.e. 8-12 days in a year with over 200 work days), they are not subject to direct supervision.  While NPC asserts that Reps work out of their homes, Plaintiffs vigorously argue they do not.  (See Pls.' Response to DSUF at 2-3.)  Plaintiffs are off on an unrelated tangent.  The appropriate standard is whether the employee works away from his employer's place of business.  Reps clearly work outside of NPC's offices and therefore satisfy this requirement.

Plaintiffs further contend that, because of modern technology, Reps no longer enjoy "the degree of autonomy traditionally associated with outside salespersons" such as the salespersons in Jewel Tea.  (Pl. Opp. at 23.)  This argument is unconvincing.  The salespersons in Jewel Tea were expected to report for work at 7 a.m. each day, were required to perform certain clerical tasks, kept logs of their work in "route books" that were subject to review by supervisors, and interacted with stock managers in order to obtain the items they sold.  118 F.2d at 204-05.  Today's technology, such as cell phones and e-mail, may be quicker, but its function is still the same.  Reps are not punching a clock and a manager is not looking over their shoulders.  The autonomy they enjoy makes it more difficult to tie them to an hours-based compensation scheme—which is one of the factors the outside sales exemption is designed to take into account. See DOL 2004 Final Rule, 69 Fed. Reg. at 22124.

While courts have narrowly applied the outside sales exemption, see Ruggeri v. Boehringer Ingelheim Pharms., Inc., __ F. Supp. 2d __, No. 06-Civ.-1085, 2008 WL 4917850, at *3 (D. Conn. Nov. 17, 2008), recognizing the realities of the pharmaceutical industry is not incompatible with engaging in a narrow reading.  To the contrary, it produces results that reflect the exemption's terms and spirit.  Reps make sales by obtaining commitments to prescribe NPC

drugs from physicians.  They are credited with those sales and compensated accordingly by means of incentive payments.  They also work free of direct supervision.  As such, under both the FLSA and New York law, they qualify as exempt outside salespersons.

> **B.     California Law**

Under California law, an outside salesperson is defined as "any person, 18 years of age or over, who customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities."  Cal. Code Regs. tit. 8, § 11070(2)(J).  Thus, unlike the FLSA, which looks to the employee's "primary duty" to determine whether the outside sales exemption applies, 29 C.F.R. § 541.500(a)(1), the California exemption is "purely quantitative…focusing exclusively on whether the individual works more than half the working time selling or obtaining orders for contracts."  Ramirez v. Yosemite Water Co., 20 Cal. 4th 785, 797 (1999) (internal quotation marks omitted).

Three recent decisions by federal courts in the Central District of California have held that pharmaceutical sales representatives qualify as exempt outside salespersons under California law.  See Menes v. Roche Labs., Inc., No. 07-Civ.-1444, 2008 U.S. Dist. LEXIS 4230 (C.D. Cal. Jan. 7, 2008); Barnick v. Wyeth, 522 F. Supp. 2d 1257 (C.D. Cal. 2007); D'Este v. Bayer Corp.. No. 07-Civ.3206, 2007 U.S. Dist. LEXIS 87229 (C.D. Cal. Oct. 9, 2007).  The California federal courts reached their decisions by (1) determining that interpretations of the FLSA have persuasive authority for interpreting California's wage and hour laws; and (2) employing an "indicia of sales" analysis similar to the one employed in Nielsen, 302 F. Supp. 2d at 756-58, in order to conclude that pharmaceutical sales representatives qualified as outside salespersons under California law.  See Barnick, 522 F. Supp. 2d at 1262; Menes, 2008 U.S. Dist. LEXIS

4230, at *4-*5; <u>D'Este</u>, 2007 U.S. Dist. LEXIS 87229, at *14 fn.2, *16.

Plaintiffs in the present matter argue that the recent California decisions were erroneously decided because they "are at war with the doctrine established by [<u>Ramirez v. Yosemite Water Co.</u>] that California's outside sales exemption is narrower and more favorable to employees than the FLSA's version."  (Pl. Mem. at 26.)

Plaintiffs overstate the extent to which California's outside sales exemption offers greater protection to employees.  <u>Ramirez</u> involved a plaintiff who carried out a dual function for his defendant employer—he acted as a deliveryman but he also made sales.  20 Cal. 4th at 790-94. Both the trial and appellate courts concluded that the plaintiff qualified as an outside salesperson because his "prime function" was making sales.  <u>Id.</u> at 794.  The California Supreme Court reversed and remanded the case for a determination as to whether the plaintiff spent "more than half" of his time engaged in sales work, as required by California's version of the outside sales exemption.  <u>Id.</u> at 802-03.  Thus, when <u>Ramirez</u> states that "[b]y choosing not to track the language of the federal exemption and instead adopting its own distinct definition of 'outside salespersons,' the [California Industrial Welfare Commission] evidently intended to depart from federal law and to provide, at least in some cases, greater protection for employees," it is referring only to the greater protection afforded by California's quantitative test (under which a dual-function employee such as the plaintiff in <u>Ramirez</u> was likely non-exempt) in comparison to the FLSA's primary duty test (under which the plaintiff was likely exempt).  <u>Id.</u> at 797.

The primary duty/quantitative distinction has no bearing on the present case because Reps do not serve a dual function—their function is to call on physicians in order to persuade them to write prescriptions for NPC's drugs.  Thus, the only remaining question is whether the Reps function as salespersons.  For all the reasons discussed above, <u>see</u> <u>supra</u> Part IV.A, the

answer to that question is yes: within the parameters of the pharmaceutical industry, Reps make sales by persuading physicians to write prescriptions, which essentially serve as orders for NPC drugs.

Under California law, "[t]he activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed…under the Fair Labor Standards Act…."  IWC Wage Order No. 4-2001-1(A)(2)(f); see also Nordquist v. McGraw-Hill Broad. Co., 32 Cal. App. 4th 555, 572-74 (1995).  Ramirez, in highlighting the primary duty/quantitative distinction between the FLSA and California law, does nothing to upset this general principle of statutory interpretation.  Having determined that Reps are exempt outside salespersons under the FLSA, this Court may apply the same analysis under California law so long as it determines that Reps spend "more than half" of their time making sales.  Ramirez implies that employees like the Reps, whose sole function is to make sales, will easily meet California's quantitative requirement.  See 20 Cal. 4th at 801 ("If a salesperson must travel one hour to destination A in order to attempt a sale, then surely the most reasonable interpretation of the wage order is to count the hour of travel time as time spent 'selling.'").  Reps, then, are appropriately categorized as exempt outside salespersons under California law.[7]

## V.     The Administrative Exemption

### A.        The FLSA and New York Law

Even if Plaintiffs do not fall within the outside sales exemption, they are still not entitled to overtime under the FLSA or New York law because they fall within the administrative

---

[7] Barnick, Wyeth, and D'Este have been criticized for relying too heavily on "indicia of sales"—such as the fact that the plaintiffs in those cases had sales-related job titles and received specialized sales training—rather than on a direct finding that the plaintiffs actually engaged in sales.  See, e.g, Ruggeri, 2008 WL 4889813 at *13-*14.  This Court agrees that indicia of sales may not be used as a substitute for an actual finding that an employee made sales in some sense.  Nevertheless, it is significant that the Reps are hired, trained, paid and incentivized as sales personnel.  Those facts are entitled to some weight, even if they are not solely dispositive.

exemption.  Plaintiffs meet each of the administrative exemption's requirements.  Their average salary of $91,500 per year translates into a weekly salary of $1,760, which is nearly four times the statutory minimum of $455 per week.  Moreover, they engage in work that is directly related to the management or general business operations of NPC and they exercise discretion and independent judgment with respect to matters of significance.

> 1. Office or Non-Manual Work Directly Related to Management or General
> Business Operations

The first prong of the administrative exemption consists of two component parts.  In order to be exempt, an employee must (1) "perform office or non-manual work" (2) "directly related to the management or general business policies of the employer."  See 29 C.F.R. § 541.200(a).

In Reich v. John Alden Life Insurance Company, 126 F.3d 1 (1st Cir. 1997), the First Circuit addressed the performance of office or non-manual work through the prism of the DOL's administrative/production dichotomy.  John Alden involved the application of the administrative exemption to an insurance company's "marketing representatives," who were the company's primary contacts with the independent agents who ultimately sold the company's life insurance policies.  126 F. 3d at 3.  The court held that the representatives did not perform "production" work because the insurance company's products were its insurance policies, and the representatives were not involved in creating those policies.  Id. at 9.  Rather, they were involved in marketing and promoting the policies—work that was "ancillary" to the insurance company's "principal production activity."  Id. at 9-10.

Based upon the holding in John Alden, it is clear that Plaintiffs do not function as production employees.  NPC's products are the pharmaceutical drugs that it researches,

develops, and manufactures.  (See PSUF ¶ 2.)  Just as the representatives in John Alden played no role in producing insurance policies, the Reps here have nothing to do with producing NPC's drugs.  Their work, like the work of the John Alden marketing representatives, is ancillary to their employer's production work.

With respect to the second part of the analysis, Plaintiffs claim that their work is not directly related to NPC's management or general business operations because they apply policies rather than craft them.  In other words, Plaintiffs argue that they carry out day-to-day activities as opposed to performing the types of "high-level" functions the administrative exemption is designed to encompass.  (See id. at 4.)

John Alden is instructive here, as well.  The court held that the representatives' work was directly related to the insurance company's general business operations because by "disseminating information to the marketplace, understanding customers and competitors, and gathering available information," the representatives were "at the heart of John Alden's business success."  John Alden, 126 F.3d at 11-12 & fn.8.  The same can be said for NPC's Reps.  The parties do not dispute that, in carrying out their duties, one of the Reps' primary functions is to provide information about NPC pharmaceuticals to the physicians they visit.  (See PSUF ¶¶ 3, 4.)  Moreover, Reps are the only NPC employees who meet directly with physicians.  (See Def.'s Rule 56.1 Statement of Undisputed Facts ("DSUF") ¶ 8.)  As Defendant claims, Reps "are critical in maintaining NPC's positive relationship with the medical community."  (Def. Mem. at 20.)

In Amendola v. Bristol-Myers Squibb, the court reached a similar conclusion with respect to pharmaceutical sales representatives.  The court determined that the defendant pharmaceutical company had demonstrated: (1) that the Reps represented the company in meetings with

physicians; (2) that the Reps promoted the defendant's drugs; and (3) that defendant's business depended in part upon the Reps' success in educating physicians about its drugs.  558 F. Supp. 2d 459 at 476-77.  Consequently, it was clear that the Reps "perform[ed] non-manual work directly related to the general business operations of the company."  Id. at 476.[8]  On the present record, there is no doubt that NPC's Reps meet with physicians and provide them with information about NPC drugs in an attempt to persuade the physicians to write prescriptions for those drugs.  The Reps' success in obtaining prescriptions is critical to NPC's business.  The sizeable incentive payments made to Reps for generating prescriptions, as well as the more than $500 million paid to the 6,000 Reps, buttresses the conclusion that obtaining prescriptions for its drugs is critical to NPC's success.  There is no other rational explanation for the commitment of this level of financial resources to NPC's sales effort.

2. Exercise of Discretion and Independent Judgment with Respect to Matters of Significance

In Cote v. Burroughs Wellcome Co., 558 F. Supp. 883 (E.D. Pa. 1982), the court directly addressed the issue of whether the plaintiff "detailer" (as Reps were then known) exercised discretion and independent judgment with respect to matters of significance.  The court determined that, notwithstanding the restrictions placed upon her activities by her employer (which mirror the FDA's restrictions on the marketing and sales of drug products), the detailer exercised considerable discretion.  Specifically, the court found that the detailer (1) used initiative to increase sales of her assigned drugs by cultivating good working relationships with

_____

[8] In the only other decision in this Circuit to analyze the applicability of the administrative exemption to pharmaceutical sales representatives—Ruggeri—the court held that it could not make a determination as to whether the Reps' work was directly related to the defendant pharmaceutical company's general business operations because the record did not provide sufficient evidence of what the company's business operations entailed.  2008 WL 4889813 at *15-*16.  Here, however, the Court is satisfied that NPC's general business operations can be said to involve researching, developing, manufacturing, marketing, and selling prescription pharmaceuticals.  (Arena Aff. ¶ 4; see also DSUF ¶ 2; Pls.' Response to Def.'s 56.1 Statement at 2.)  The Reps' work is directly related to these operations.

doctors and their staffs, and (2) used discretion in deciding how to encourage the use of her

product.  Id. at 887.  The court therefore concluded that the plaintiff detailer fell within the

FLSA's administrative exemption.[9]

More recently, the court in Amendola reached a similar conclusion.  The court

determined that the plaintiff pharmaceutical sales representatives (1) "tailor[ed] the content of

their presentations to each medical provider based on the provider's patient population,

prescription practices, and other factors, and independently decide[d] what promotional message

[would] be most effective"; (2) determined whether to request a "commitment" (analogous to a

"close" in the present case) and, if a commitment request was appropriate, the nature of that

commitment; (3) determined how often to visit each physician; (4) added new physicians to their

call lists; (5) allocated their drug samples; and (6) decided how to spend their promotional

budgets on meals and lecture programs for their physicians.  558 F. Supp. 2d at 477.  Moreover,

the court recognized as self-evident the fact that these discretionary activities related to matters

of significance since "[Reps] seek to influence prescription writing practices—a matter of great

consequence to [defendant's] business."  Id.  While the Amendola court's findings were made in

determining whether notice to the potential plaintiff class was appropriate, id. at 462-63, it is

instructive that the court found that the second requirement of the administrative exemption was

likely satisfied.  Id. at 477.

Cote and Amendola are directly applicable here.  Plaintiff Reps engage in many of the

same discretionary activities.  Reps are expected to use initiative to increase the number of

prescriptions written for their drugs—oftentimes, this involves building a good rapport with the

physicians and their staffs.  Within the confines of the "core messages" created by NPC, Reps

---

[9] The court in Cote did not need to address the issue of whether the detailer performed work directly related to her employer's management or general business operations because the defendant employer conceded that she did.  558 F. Supp. at 886.

must decide how best to present their information and must determine what type of "close" is most appropriate in a given situation.  This, of course, depends on how much time the physician will allow the Rep, the physician's patient base and prescribing history, and numerous other factors.  Reps set their daily call schedules and are expected to use their entertainment budgets to host informational events for the physicians on their target lists.  In carrying out these activities, they are quite clearly attempting to increase prescriptions for their drugs—a matter of considerable significance for NPC.  In short, the discretionary nature of their duties closely resembles that of the plaintiffs in <u>Cote</u> and <u>Amendola</u>.

  Throughout their papers, and at oral argument, Plaintiffs have characterized themselves as mere "robots" or "automatons" who enjoy no room to act with discretion or independent judgment within the stringent confines of NPC's regulations.  (<u>See</u>, <u>eg.</u>, Pl. Mem. at 12-15; OA Tr. at 32:5-18.)  These labels are not facts, but merely arguments designed to avoid the overtime exemptions.  They do not begin to answer why or how a robot or an automaton could or should earn an average salary of $91,500 per year.  Nor do they explain why NPC would employ 6,000 Reps at a cost in excess of half a billion dollars per year.  They are an attempt to avoid the consequences of what Reps do every day—arranging to call on physicians and, after assessing how much time is available for the call, choosing the best possible approach to convince the physician to prescribe NPC drugs the next time an appropriate patient opportunity presents itself.  NPC pays a good salary and material incentives to encourage this behavior.  Reps are given drug samples, printed materials, and core messages.  They are dispatched to the offices of physicians in an attempt to convince those physicians to prescribe NPC products.  It defies logic to accept that, in such a situation, Reps are expected to do nothing but chant slogans and mouth platitudes.  At the bare minimum, Reps must be capable of tailoring their presentation to a given

timeframe—deciding how best to convey the "core message" in a manner that will have the desired effect on the physician.  Such a decision involves making an independent judgment, free of direct oversight, even if NPC has provided Reps with guidelines for conveying certain information in a certain manner.  Thus, while the exact nature of the discretion and independent judgment exercised by Reps may be in dispute, <u>Cote</u> and <u>Amendola</u> make clear that, on the present facts, NPC's Reps have discretion and exercise independent judgment.

Courts routinely hold that employees may exercise discretion and independent judgment, even when they carry out their duties within the confines of a highly regulated industry.  <u>See</u>, <u>e.g.</u>, <u>Amendola</u>, 558 F. Supp. 2d at 476 (recognizing that "courts have frequently concluded that the administrative exemption applies even in those situations in which the employee's discretion in the performance of her duties is circumscribed by an employer's detailed instructions or industry regulations" (citations omitted)).  At oral argument, Plaintiffs readily admitted that "because of the [pharmaceutical industry's] regulations, the [R]eps are tightly circumscribed." (OA Tr. at 33:9-10.)  Within these regulations, however, the Reps do exercise ample discretion and make independent judgments.  This fully satisfies the second requirement of the administrative exemption.  Thus, under the FLSA and New York law, Plaintiffs are appropriately categorized as exempt administrative employees.

**B.     California Law**

California employs a five-part test for determining whether an employee is covered by the state's administrative exemption.  In order for the exemption to apply, the employee must: (1) perform "office or non-manual work directly related to management policies or general business operations" of the employer or its customers; (2) "customarily and regularly exercise…discretion and independent judgment"; (3) perform his or her duties under only

general supervision; (4) be "primarily engaged" in activities meeting the test for the exemption; and (5) earn twice the state's minimum wage.  Cal. Code Reg., tit. 8, § 11070(1)(A)(2).  As is the case with the outside sales exemption, the primary difference between the FLSA and California versions of the administrative exemption is California's quantitative test.  As previously discussed, Reps do not perform the types of dual functions that typically necessitate a quantitative analysis.  Having determined that the function they do perform qualifies as administrative under the FLSA, the Court need not undertake further analysis to conclude that Reps are similarly exempt administrative employees under California law.

## VI.    Highly Compensated Employee Exemption

Defendant identifies certain members of the Plaintiff class who it claims fall within the highly compensated employee exemption because (1) they earned at least $100,000 in annual compensation in the years 2004 through 2006, and (2) they customarily and regularly performed the duties of an administrative employee.  (Def. Mem. at 27-28; App'x to Def. Mem. Tab 46.)[10] The Court has already determined that Plaintiffs are exempt from the FLSA's overtime requirement because they qualify as outside salespersons and administrative employees.  Thus, to the extent the Plaintiffs identified by Defendant did, in fact, earn at least $100,000 in annual compensation between 2004 and 2006, they also meet the requirements for the highly compensated employee exemption.  Since the Court has already held the Plaintiff class in its entirety exempt on other grounds, however, it need not reach the subordinate issue of whether certain Plaintiffs fall within this exemption.

---

[10] According to NPC, of the nearly 700 members of the Plaintiff class, 42 earned total compensation in excess of $100,000 in 2004, 49 in 2005, and 31 in 2006.  (App'x to Def. Mem. Tab 46.)

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED

Plaintiffs' motion for summary judgment is DENIED. The Clerk of the Court is directed to enter

judgment and terminate this matter.

Dated: New York, New York
January 12, 2009

SO ORDERED

PAUL A. CROTTY
United States District Judge